**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LINDA BONNIE SCRIPNICENCU,<br><br>            Plaintiff,<br><br>    v.<br><br>LSF9 MASTER PARTICIPATION TRUST, et al.<br>            Defendants. | CIVIL ACTION NO.: 2:19-CV-05280-GAM<br><br>*Civil Action* |

**PLAINTIFF'S MOTION TO RECONSIDER PURSUANT TO F.R.C.P. 60(b)**

<u>SUMMARY</u>

Pursuant to 60(b)(1), (2), (4) and (6) " the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)… (4) the judgment is void; … (6) any other reason that justifies relief.". We file this motion regarding the order to grant dismissal. We plead with the court to not only amend its prior order and opinion entered back on August 18, 2020.  – Opinion was not actually handled with the proper standard in regards to facts.

<u>MATERIAL FACTS AND PROCEDURAL POSTURE</u>

Initially, Plaintiff attempted to reach out to Suntrust (the servicer at the time) for assistance with their mortgage. Suntrust was unwilling to help and specifically was unwilling to speak with Plaintiff for years; only to her late husband. They claimed she had no interest and as such, were

## CERTIFICATION OF LINDA BONNIE SCRIPNICENCU

1. Initially, I attempted to reach out to Suntrust (the servicer at the time) for assistance with their mortgage.

2. Suntrust was unwilling to help and specifically was unwilling to speak with I for years; only to my late husband.

3. They claimed I had no interest and as such, were unwilling to speak with me.

4. While Suntrust was not directly responsible for the actions in this complaint, their failure to properly address the situation exacerbated the situation.

5. One afternoon, I arrived home to see many missed calls from an unknown number.

6. I returned the calls to find that it was Seterus attempting to make contact.

7. They stated that my name was not on the mortgage; therefore they could not speak with my or disclose any information pertaining to the mortgage.

8. That was incorrect I explained to them that my name was in fact on the mortgage, yet they insisted I have George, my former husband, contact them.

9. I told them that George had recently returned to work and would not be home until very late due to overtime.

10. The representative that I was speaking with told me that George's work hours were not an issue, that he could call late, as for their company could be contacted amongst different time zones.

11. George returned Seterus' call and was informed that the company had made a miscalculation with their monthly payments.

12. He was told that instead of $1,900 per month, they were supposed to be paying $2,900 per month.

13. This was disheartening to hear, especially since George had to explain that if they made payments that large, they would have nothing left to pay for any other monthly expenses.

14. He tried to negotiate this price for several hours but ended his phone call without success.

15. At a later date, Seterus sent I and my former husband a message via FedEx that they would accept a payment amount of $1,600 per month.

16. Abruptly after this notification, my husband, George, passed away.

17. The morning of his passing, I received a phone call from Seterus.

18. During this phone call, I informed the company of my loss.

19. At a loss for words, the representative said that I would call back in five days.

20. After five days, I received the phone call that I was expecting and was asked whether or not I planned to stay in my home.

21. This phone call involved my, a female representative, and two males participating in the background on Seterus' end.

22. I felt that the call was set up as a tactic of intimidation.

23. The primary individual who was causing my the severe stress was Ross Bowman.

24. With the loss I was still grieving over, I was unable to give the company an answer.

25. I did not feel that I could trust them to receive payments from my without abruptly altering the payment amount like they had before.

26. Immediately after, I sought the legal services of Attorney Robert Birch.

27. I signed a retainer as of May 18, 2014 for $3,500.00 to hire Robert Birch, I wrote the check for $3,500.00 on May 28, 2014.

28. Under the advisement of Robert Birch, I visited the Bucks County Courthouse to receive the property records for my home.

29. Once I obtained these records, I turned them over to Mr. Birch and together they saw that they showed that I was indeed a signer on the mortgage.

30.  I paid Robert Birch attorney fees of $3,500.00 to represent my and he assured my that he would handle it and contact my when necessary.

31.  I was told not to communicate with Seterus or make payments until Mr. Birch made a payment agreement.

32. For more than two years, I could make no payments on the mortgage as the foreclosure action was pending and they would not accept these payments, nor was I permitted to modify during that time as Mr. Birch did not get them to agree to do so, as he stated initially that he would.

33. I would reach out to Mr. Birch weekly to stay updated and he insisted that he would be the one to make contact if there were to be a development.

34. Mr. Birch mentioned to me that the case was moving slowly due to the Bucks County Courthouse being flooded with similar cases.

35. Approximately two years later, I received a letter from the Court of Bucks County for the summary judgment being entered to permit the foreclosure of my home.

36. This order was entered on August 19, 2016.

37. I frantically contacted Mr. Birch right away and he was surprised as he told my he did not receive the order and was unsure as to why I did.

38. He then informed me that he may not have gotten the same letter as I did due to his office relocation during the time he was representing my.

39. I felt that he neglected to keep my informed, as his client, of his office location, and this posed an issue.

40. Mr. Birch then, in response to my panic over the disclosure letter, told my he had not made my any guarantees when in fact, he had promised to work out a resolution with Seterus.

41. Further, he specifically told my that it was my fault, since I had not being paying my mortgage for two years.

42. The same day I received the foreclosure letter, I researched my case online to discover that during the time that Robert Birch had been representing my case, he had made several errors in the case.

43. During the many months between updates on my case, I would contact him and he would tell my that there were no new developments and that the courts were still behind.

44. On September 15, 2016 Defendant Birch, when asked about a loan modification that he told I he had been working on during the **two years he had the case** stated "I did not do any modification. Linda may have done one herself".

45. **This was inaccurate, and a complete misrepresentation, as he told my not to speak with any of the servicers and that he would handle the matter and that was my understanding.**

46. A praecipe to enter judgment was then filed on March 20, 2017.

47. Further, the day the Foreclosure sale notice was delivered to me, Mr. Birch said that it was my fault, that I did not pay the mortgage, and that it was not his fault.

48. This all showed my that he had been failing to actually keep my up to date and send my the necessary documents I needed in order to comply with the courts. My goal had always been to come to an agreement on a fair payment price in order to keep my home, and made this clear to Birch the day he was hired.

49. After firing Mr. Birch and hiring the current counsel, I was able to procure a new modification agreement in March, 2018.

50. **I has been paying on it ever since, even with the payment fluctuations.**

51. In order to do so however, I had to file a bankruptcy in order to do so, since due to Mr. Birch's failure to act, a Sheriff Sale had been scheduled.

52. Further, this new agreement now extended a new **forty years**, until April 1, 2058.

53. Further, there was a substantial amount of principal added to this new modification.

54. My total payment was then set at $1,543.63, and that should have never changed, as the loan modification never called for it, even though my alleged payments have now fluctuated wildly, as broken down below.

55. While I accepted this modification, it was essentially under duress, as the other choice was to lose my home.

56. Further, the modification agreement admits that there is additional principal being added in of **$65.380.99.**

57. There was no basis for this, nor has the servicer ever produced it.

58. Additionally, the payments being set at $1,543.63 shows that the original amount offered of $1,900.00 was correct in the first place, and that the $1,600.00 was **not** a "gift" or "favor" but that the $2,900.00 was in error, contrary to what the court seemed to indicate in its earlier opinion.

59. But for the actions of Defendants Caliber Home Loans (Caliber), Seterus, Inc. LSF9 MASTER PARTICIPATION TRUST (LSF9), Shellpoint Mortgage Servicing, and Mr. Cooper (Bank defendants) and the failure to properly act by Defendant Birch, this additional amount never would have been added in to the modification, nor would I have been responsible for making payments for such a new extended period of time.

60. It is specifically alleged that the different amounts quoted by Seterus as discussed above, such as **raising the amount owed by $1,000.00** caused a substantial amount to be added into the principal amount owed, as once the Foreclosure case was filed, payments would not be accepted.

61. Further, if Defendant Birch had properly applied for a modification as he was hired to do, then the case would not have languished either, and the amount owed would not have increased as much.

62. Due solely to the actions of I and my current attorney, a Praecipe to Vacate judgment was filed on June 29, 2018 and a Praecipe To Discontinue & End was finally filed on July 2, 2018.

63. This means that there are **no judgments** that can be relied on from that case, as the Foreclosure has been dismissed, and as such, the fact it was filed should not be held against me as was argued in the prior motions and cited in the opinion, but was only permitted to proceed because of the actions of the Bank Defendants and Defendant Birch.

64. Further however, in the case, defendants admitted that LSF9 was the party who was responsible for all of these egregious acts and as such, is responsible for the actions of its servicers.

65. As such, they cannot now claim they are not responsible for the actions taken in this complaint by their servicers, as they are estopped from such a fundamentally false claim.

66. Further, the payment that I am now paying, could have been received years ago, prior to the Foreclosure action being filed and prior to the bankruptcy being needed, but because of the various actions and inactions taken by Defendants, I had to have my credit ruined in order to obtain the same "benefit" I was entitled to years before and accrue $65.380.99 in additional principal, as well as pay thousands in attorneys fees.

67. These alone are substantial ascertainable losses that I incurred.

68. The loan modification discussion that occurred prior to the Foreclosure with Seterus, during one of the most difficult times of My life, was purely denied previously for the unjust enrichment of LSF9, Caliber, and Mr. Cooper.

69. I spoke with Richard at Caliber Home Loans on 9/3/19. Badge #27882 .

70. I was told I has a negative balance of $29,000.00 in escrow.

71. I had received no prior warning of this, and this amount was apparently in addition to the escrow arrearage that had already been included as part of the modification.

72. As such, my  mortgage payment was being increased due to taxes and insurance by $3,600 a year.

73. I was further informed that was **in addition to** the approximately $70,000.00 in arrears that was put on the back of loan.

74. The was approximately an increase of $332 per month, which put a substantial financial strain on I due to the fact I am a widow on a fixed income.

75. At **no time** however, have I failed to make a payment.

76. I made the $1,875.89 payments from October 1, 2019 through January, 2020.

77. It was not until February, 2020 when it dropped, but not back to what it was, instead to approximately $1,606.00.

78. Once again, the fact the payment, even increased, is now at $1,606.00, shows that the "payment of $1,600 per month" was **not** "$300 less than the amount they were already being undercharged" but the actual amount owed, which is why the higher amounts being quoted amounted to the substantial claims we have asserted.

79. At no time, has any party indicated that the amount actually owed was $2,900, $1,900 or anything close to those mistaken amounts, so it is unclear why the court claimed in their facts, which are supposed to be found in favor of me, why that was the case.

80. It is also worth noting that even though Shellpoint Mortgage Servicing (Shellpoint) became the servicer on November 1, 2019, my payments were still being accepted by Caliber.

81. Nonetheless, neither Shellpoint nor Caliber has been able to clarify how such an egregious amount was accrued as an escrow deficiency, nor why the payments were changed without warning, then suddenly changed back.

82. This too is a seeming breach of contract of the new Loan modification, which I has been current on for almost **two years.**

83. This too has caused great strain on me.

84. As such, the total **actual damages** incurred because of the Defendants' actions was $166,021.88 with new actual damages being incurred at the rate of $62.37 for the increased payments above and beyond what was agreed to in the loan modification.

85. These were the facts when the opinion was entered on August 18, 2020.

86. It should be noted, at the outset, that the opinion relies, in large part, on the Foreclosure matter, even though the court knew, or should have known that the case had been dismissed, because a modification had been entered into, as was stated in the second amended complaint.

87. It should be noted, that I have not missed a payment, even to this day.

88. It is unclear why the court did not fully consider these facts when entering its opinion, and why it phrased it's facts in such a way that was seemingly biased against me.

89. I had been recovering from some medical issues since mid-2020, yet now that I is further along, I was shocked that the court turned a blind eye to Defendants Caliber Home Loans (Caliber), Seterus, Inc. LSF9 MASTER PARTICIPATION TRUST (LSF9), Shellpoint Mortgage Servicing, and Mr. Cooper (Bank defendants)'s actions, as well as dismissing the case with prejudiced against Birch, when he had not filed a single item in defense of his actions.

90. In the court's foot note, it is stated that the case against him is dismissed, yet there is no reasoning for this.

91. As such, if the case is to be dismissed, the state court claims should be remanded so they can proceed, or, what should occur is this case be permitted to proceed on its merits.

## VERIFICATION

I, LINDA BONNIE SCRIPNICENCU the undersigned, certify that the facts set forth in the foregoing legal document are true and correct to the best of my knowledge, or information, and belief.  I make this Verification subject to the penalties of 18 Pa. C.S. Section 4904 relating to

unsworn falsification to authorities which provides that if I knowingly make false statements, I

may be subject to criminal penalties.

LINDA BONNIE SCRIPNICENCU

unwilling to speak with her. While Suntrust was not directly responsible for the actions in this complaint, their failure to properly address the situation exacerbated the situation.

One afternoon, Plaintiff Scripnicencu arrived home to see many missed calls from an unknown number. Ms. Scripnicencu returned the calls to find that it was Seterus attempting to make contact. They stated that her name was not on the mortgage; therefore they could not speak with her or disclose any information pertaining to the mortgage. That was incorrect Ms. Scripnicencu explained to them that her name was in fact on the mortgage, yet they insisted Ms. Scripnicencu have George, her former husband, contact them. Ms. Scripnicencu told them that George had recently returned to work and would not be home until very late due to overtime. The representative that Ms. Scripnicencu was speaking with told her that George's work hours were not an issue, that he could call late, as for their company could be contacted amongst different time zones. George returned Seterus' call and was informed that the company had made a miscalculation with their monthly payments.  He was told that instead of $1,900 per month, they were supposed to be paying $2,900 per month. This was disheartening to hear, especially since George had to explain that if they made payments that large, they would have nothing left to pay for any other monthly expenses. He tried to negotiate this price for several hours but ended his phone call without success. At a later date, Seterus sent Ms. Scripnicencu and her former husband a message via FedEx that they would accept a payment amount of $1,600 per month.

"Facts misrepresented:

Then, in late-2013 or early-2014, the Scripicencus received communication from the loan servicer, Seterus, indicating that their mortgage payment of $1,900 per month was $1,000 lower than it should have been. (SAC ¶¶ 15-16.) Nevertheless, Seterus sent the Scripicencus a letter via FedEx, stating that it would accept a payment of $1,600 per month, or $300 less than the amount they were **already being undercharged.** (SAC ¶ 19.)

"

Abruptly after this notification, Ms. Scripnicencu's husband, George, passed away. The morning of his passing, Ms. Scripnicencu received a phone call from Seterus. During this phone call, Ms. Scripnicencu informed the company of her loss. At a loss for words, the representative said that she would call back in five days. After five days, Ms. Scripnicencu received the phone call that she was expecting and was asked whether or not she planned to stay in her home. This phone call involved her, a female representative, and two males participating in the background on Seterus' end. Ms. Scripnicencu felt that the call was set up as a tactic of intimidation. The primary individual who was causing her the severe stress was Ross Bowman. With the loss Ms. Scripnicencu was still grieving over, Ms. Scripnicencu was unable to give the company an answer. Ms. Scripnicencu did not feel that she could trust them to receive payments from her without abruptly altering the payment amount like they had before. Immediately after, Ms. Scripnicencu sought the legal services of Attorney Robert Birch.

Plaintiff signed a retainer as of May 18, 2014 for $3,500.00 to hire Robert Birch, she wrote the check for $3,500.00 on May 28, 2014. Under the advisement of Robert Birch, Ms. Scripnicencu visited the Bucks County Courthouse to receive the property records for her home. Once Ms. Scripnicencu obtained these records, she turned them over to Mr. Birch and together they saw that they showed that she was indeed a signer on the mortgage. Ms. Scripnicencu paid Robert Birch attorney fees of $3,500.00 to represent her and he assured her that he would handle it and contact her when necessary. **Ms. Scripnicencu was told not to communicate with Seterus or make payments until Mr. Birch made a payment agreement.**

3

**"For more than two years, Plaintiff made no payments on the mortgage as the foreclosure action wended its way through the court system. (SAC ¶¶ 35-38.)" – they would not accept these payments, nor was she permitted to modify during that time**

Ms. Scripnicencu would reach out to Mr. Birch weekly to stay updated and he insisted that he would be the one to make contact if there were to be a development. Mr. Birch mentioned to her that the case was moving slowly due to the Bucks County Courthouse being flooded with similar cases.

Approximately two years later, Ms. Scripnicencu received a letter from the Court of Bucks County for the summary judgment being entered to permit the foreclosure of her home. This order was entered on August 19, 2016.  Ms. Scripnicencu frantically contacted Mr. Birch right away and he was surprised as he told her he did not receive the order and was unsure as to why Ms. Scripnicencu did. He then informed her that he may not have gotten the same letter as Ms. Scripnicencu did due to his office relocation during the time he was representing her. Ms. Scripnicencu felt that he neglected to keep her informed, as his client, of his office location, and this posed an issue. Mr. Birch then, in response to her panic over the disclosure letter, told her he had not made her any guarantees when in fact, he had promised to work out a resolution with Seterus. Further, he specifically told her that it was her fault, since she had not being paying her mortgage for two years. The same day Ms. Scripnicencu received the foreclosure letter, Ms. Scripnicencu researched her case online to discover that during the time that Robert Birch had been representing her case, he had made several errors in the case. During the many months between updates on her case, Ms. Scripnicencu would contact him and he would tell her that there were no new developments and that the courts were still behind.

4

On September 15, 2016 Defendant Birch, when asked about a loan modification that he told Plaintiff he had been working on during the **two years he had the case** stated "I did not do any modification.  Linda may have done one herself, so you need to ask her. " **This was inaccurate, and a complete mispresentations, as he told her not to speak with any of the servicers and that he would handle the matter and that was her understanding.** A praecipe to enter judgment was then filed on March 20, 2017. Further, the day the Foreclosure sale notice was delivered to Ms. Scripnicencu, Mr. Birch said that it was her fault, that she did not pay the mortgage, and that it was not his fault. This all showed her that he had been failing to actually keep her up to date and send her the necessary documents Ms. Scripnicencu needed in order to comply with the courts. Ms. Scripnicencu's goal had always been to come to an agreement on a fair payment price in order to keep her home, and made this clear to Birch the day he was hired.

After firing Mr. Birch and hiring the current counsel, Ms. Scripnicencu was able to procure a new modification agreement in March, 2018. **She has been paying on it ever since, even with the payment fluctuations.** In order to do so however, she had to file a bankruptcy in order to do so, since due to Mr. Birch's failure to act, a Sheriff Sale had been scheduled. Further, this new agreement now extended a new **forty years**, until April 1, 2058. Further, there was a substantial amount of principal added to this new modification.

Her total payment was then set at $1,543.63, and that should have never changed, as the loan modification never called for it, even though her alleged payments have now fluctuated wildly, as broken down below. While she accepted this modification, it was essentially under duress, as the other choice was to lose her home. Further, the modification agreement admits that there is additional principal being added in of **$65,380.99.** There was no basis for this, nor has the servicer ever produced it. Additionally, the payments being set at $1,543.63 shows that he original

amount offered of $1,900.00 was correct in the first place, and that the $1,600.00 was **not** a "gift" or "favor" but that the $2,900.00 was in error. [reference this with the judge's statements]

But for the actions of Defendants Caliber Home Loans (Caliber), Seterus, Inc. LSF9 MASTER PARTICIPATION TRUST (LSF9), Shellpoint Mortgage Servicing, and Mr. Cooper (Bank defendants) and the failure to properly act by Defendant Birch, this additional amount never would have been added in to the modification, nor would Plaintiff have been responsible for making payments for such a new extended period of time. It is specifically alleged that the different amounts quoted by Seterus as discussed above, such as **raising the amount owed by $1,000.00** caused a substantial amount to be added in to the principal amount owed, as once the Foreclosure case was filed, payments would not be accepted. Further, if Defendant Birch had properly applied for a modification as he was hired to do, then the case would not have languished either, and the amount owed would not have increased as much.

Due solely to the actions of Ms. Scripnicencu and her current attorney, a Praecipe to Vacate judgment was filed on June 29, 2018 and a Praecipe To Discontinue & End was finally filed on July 2, 2018. This means that there are **no judgments** that can be relied on from that case, as the Foreclosure has been dismissed, and as such, the fact it was filed should not be held against Plaintiff as was argued in the prior motions and cited in the opinion, but was only permitted to proceed because of the actions of the Bank Defendants and Defendant Birch.

Further however, in the case, defendants admitted that LSF9 was the party who was responsible for all of these egregious acts and as such, is responsible for the actions of its servicers. As such, they cannot now claim they are not responsible for the actions taken in this complaint by their servicers, as they are estopped from such a fundamentally false claim. Further, the payment

6

that Plaintiff is now paying, could have been received years ago, prior to the Foreclosure action being filed and prior to the bankruptcy being needed, but because of the various actions and inactions taken by Defendants, she had to have her credit ruined in order to obtain the same "benefit" she was entitled to years before and accrue $65.380.99 in additional principal, as well as pay thousands in attorneys fees. These alone are substantial ascertainable losses that Plaintiff incurred. The loan modification discussion that occurred prior to the Foreclosure with Seterus, during one of the most difficult times of Plaintiff's life, was purely denied previously for the unjust enrichment of LSF9, Caliber, and Mr. Cooper.

Plaintiff spoke with Richard at Caliber Home Loans on 9/3/19. Badge #27882 . She was told she has a negative balance of $29,000.00 in escrow. She had received no prior warning of this, and this amount was apparently in addition to the escrow arrearage that had already been included as part of the modification. As such, her  mortgage payment was being increased due to taxes and insurance by  $3,600 a year. She was further informed that was **in addition to** the approximately $70,000.00 in arrears that was put on the back of loan. The was approximately an increase of $332 per month, which put a substantial financial strain on Plaintiff due to the fact she is a widow on a fixed income. At **no time** however, has Plaintiff failed to make a payment. She made the $1,875.89 payments from October 1, 2019 through January, 2020. It was not until February, 2020 when it dropped, but not back to what it was, instead to approximately $1,606.00. once again, the fact the payment, even increased, is now at $1,606.00, shows that the "payment of $1,600 per month" was **not** "$300 less than the amount they were already being undercharged" but the actual amount owed, which is why the higher amounts being quoted amounted to the substantial claims we have asserted. At no time, has any party indicated that the amount actually owed was $2,900, $1,900 or

anything close to those mistaken amounts, so it is unclear why the court claimed in their facts, which are supposed to be found in favor of Plaintiff, why that was the case.

It is also worth noting that even though Shellpoint Mortgage Servicing (Shellpoint) became the servicer on November 1, 2019, her payments were still being accepted by Caliber. Nonetheless, neither Shellpoint nor Caliber has been able to clarify how such an egregious amount was accrued as an escrow deficiency, nor why the payments were changed without warning, then suddenly changed back. This too is a seeming breach of contract of the new Loan modification, which Plaintiff has been current on for almost **two years.** This too has caused great strain on Plaintiff. As such, the total **actual damages** incurred because of the Defendants' actions was $166,021.88 with new actual damages being incurred at the rate of $62.37 for the increased payments above and beyond what was agreed to in the loan modification.

These were the facts when the opinion was entered on August 18, 2020. It should be noted, at the outset, that the opinion relies, in large part, on the Foreclosure matter, even though the court knew, or should have known that the case had been dismissed, because a modification had been entered into, as was stated in the second amended complaint. It should be noted, that Plaintiff has not missed a payment, even to this day. It is unclear why the court did not fully consider these facts when entering its opinion.

Plaintiff had been recovering from some medical issues since mid-2020, yet now that she is further along, she was shocked that the court turned a blind eye to Defendants Caliber Home Loans (Caliber), Seterus, Inc. LSF9 MASTER PARTICIPATION TRUST (LSF9), Shellpoint Mortgage Servicing, and Mr. Cooper (Bank defendants)'s actions, as well as dismissing the case with prejudiced against Birch, when he had not filed a single item in defense of his actions. In the

court's foot note, it is stated that the case against him is dismissed, yet there is no reasoning for this. As such, if the case is to be dismissed, the state court claims should be remanded so they can proceed, or, what should occur is this case be permitted to proceed on its merits.

LEGAL ARGUMENT

"On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); and (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party". Rule 60(b) thus provides "a grand reservoir of equitable power to do justice in a particular case." Cox v. Horn, 757 F.3d 113, 122 (3d Cir. 2014) (internal quotation marks omitted), cert. denied sub nom. Wetzel v. Cox, 135 S. Ct. 1548 (2015). As made patent in Coltec Industries, Inc. v. Hobgood, a movant's particular situation in the context of a Rule 60(b)(6) motion is vitally important. Coltec Industries, Inc. v. Hobgood 280 F.3d 262, 274–75 (3d Cir. 2002). Additionally, pursuant to F.R.C.P. 60(c) a motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding. Nowhere in Local R. Civ. P. 7.1(g) does it state the time frame for a motion pursuant to rule 60(b) is modified in any way.

The facts of the case are certified by Plaintiff as accurate, and the court should have given then difference merited by the 12(b)(6) standard, and not disregarded out of hand as appears to be the case as "difficult to determine" claiming that are indecipherable. (See Exhibit A Plaintiff's Certification). As the court acknowledges, they do, in fact, hinge on "a series of misrepresentations and deceptive conduct in which Defendants" engaged. These were accurate, and now certified to by Plaintiff, and should be given the proper deference. As the court states, the applicable standard

9

is from *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). that "a motion to dismiss pursuant to Fed.R.Civ.P. Rule 12(b)(6), the Court accepts the well-pleaded factual allegations of the complaint as true, and draws all reasonable inferences therefrom in favor of the plaintiff." *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital*, 185 F.3d 154, 155 (3d Cir. 1999). A claim should not be dismissed for failure to state a claim unless it appears beyond a doubt that the non-moving party can prove no set of facts in support of its allegations which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Marshall-Silver Construction Co. v. Mendel*, 894 F.2d 593, 595 (3d Cir. 1990).

In making this determination, the court must construe the pleading in the light most favorable to the non-moving party. Budinsky v. Pennsylvania Dept. of Environmental Resources, 819 F.2d 418, 421 (3d Cir. 1987). As the United States Court of Appeals for the Third Circuit explained: "A Rule 12(b)(6) motion will be granted "`if it appears to a certainty that no relief could be granted under any set of facts which could be proved.'" Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005) (quoting D.P. Enter. Inc. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984)). We must accept all factual allegations in [plaintiff's] complaint as true, but we are not compelled to accept "unsupported conclusions and unwarranted inferences," Schuylkill Energy Res., Inc. v. Pa. Power Light Co., 113 F.3d 405, 417 (3d Cir. 1997), or "a legal conclusion couched as a factual allegation," Papasan v. Allain, 478 U.S. 265, 286 (1986)." Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007).

I.   THE UTPCPL CLAIM SHOULD PROCEED

Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 P.S. § 201-1, et seq., states an extensive definition of conduct deemed to be "unfair methods of

competition" and "unfair or deceptive acts or practices." At all times relevant and material hereto the Plaintiff were consumers of the Defendants goods and services and as such the conduct of the Defendants and the transaction was governed by the Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 Pa. C.S. § 201-1 et seq. Section 201-2(4) lists twenty enumerated practices which constitute actionable practices that may be considered "unfair methods of competition" or "unfair or deceptive acts or practices." 73 P.S. Section 201-2(4)(i)-(xx). Additionally, other practices, such as the ones in this case, can also be includes under the "catchall provision," codified at 73 P.S. Section 201-2(4)(xxi). The UTPCPL provides that: "The court may, in its discretion, award up to three times the actual damages sustained…." UTPCPL, 73 P.S. § 201-9.2.  In *Bennett v. A.T. Masterpiece Homes*, 2012 Pa. Super 60 (2012) the Superior Court held that amendments to the UTPCPL eliminated the requirement of showing common law fraud thus making the UTPCPL a broader remedy than allowed under a common law fraud theory. The appropriate standard, pursuant to the language of the 1996 amendment, permitted catchall liability for deceptive conduct, not fraud. Id. at 6. The Superior Court has held, based on policy considerations, that the private-right-of-action provision of the UTPCPL extends to real estate transactions, *Gabriel v. O'Hara*, 368 Pa. Super. 383, 388-92, 534 A.2d 488, 491-93 (1987). The actions of the Bank Defendants individually and/or jointly, were performed in direct contradiction to their promises of superior services and conduct, but instead for their own financial self-interests, in detriment to the rights and position of the Plaintiff. Specifically, as stated above, they caused an ascertainable loss of actual damages of over $166,021.88, damage to Plaintiff's credit and new actual damages being incurred at the rate of $62.37 for the increased payments above and beyond what was agreed to in the loan modification. In additional, there was the pain and suffering Plaintiff suffered, that is also an ascertainable loss as well.

11

II.     BREACH OF CONTRACT CLAIMS AGAINST ALL DEFENDANTS, INCLUDING BIRCH, SHOULD BE PERMITTED TO PROCEED

In Pennsylvania, a breach of contract action involves (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages. J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.,792 A.2d 1269 (Pa.Super.2002). In a breach of contract action, **damages are awarded to compensate the injured party for loss suffered due to the breach.** *Maxwell v. Schaefer*, 381 Pa. 13, 21, 112 A.2d 69, 73 (1955); *Harman v. Chambers*, 358 Pa. 516, 521, 57 A.2d 842, 845 (1948); *Mancini v. Morrow,* 312 Pa.Super. 192, 204, 458 A.2d 580, 586 (1983). The purpose of damages is to put the plaintiff in the position he or she would have been in but for the breach. Id. The measure of recovery and the method of evaluation that are adopted should in every case be so adjusted as to attain as nearly as possible the purpose of our system of remedial justice. Id.

At all times relevant and material hereto the Defendants did breach the contractual terms of the loan/note (contract) by engaging in deceptive and fraudulent practices as hereinbefore set forth. Pennsylvania does not recognize a claim for breach of covenant of good faith and fair dealing as an independent cause of action. *Seiple v. Comty. Hosp. of Lancaster*, No. 97-cv- 8107, 1998 U.S. Dist. LEXIS 5093, 1998 WL 175593, at E.D. Pa. April 14, 1998.  Recent case law confirms this as the prevailing rule in Pennsylvania. See, e.g., *LSI Title Agency, Inc. v. Eval. Servs., Inc*., 2008 PA Super 126, 951 A.2d 384, 391 (Pa. Super.2008), appeal denied, 960 A.2d 841 (Pa.2008) (citing cases holding that Pennsylvania does not recognize separate breach of contractual duty of good faith and fair dealing where that claim is subsumed by separately pled breach of contract claim.); J*HE, Inc. v. SEPTA*, No. 1790 NOV. TERM 2001, 2002 Phila. Ct. Com. Pl. LEXIS 78, 2002 WL 101894,1 at (Pa. Com. Pl. May 17, 2002) ("[T]he implied covenant of good faith does

*not* allow for a claim separate and distinct from a breach of contract claim . . . [A] claim arising from a breach of the covenant of good faith must be prosecuted as a breach of contract claim, as the covenant does nothing more than imply certain obligations into the contract itself.') (collecting cases from other jurisdictions adopting same rule) (emphasis in original); *Commonwealth v. BASF Corp.*, No. 3127, 2001 Phila. Ct. Com. Pl. LEXIS 95, 2001 WL 1807788, at (Pa. Com. Pl. Mar.15, 2001) ('Pennsylvania law does not allow for a separate cause of action for breach of either an express or implied duty of good faith, absent a breach of the underlying contract.').

Federal courts construing Pennsylvania law have adhered to the same rule. See e.g., *Chanel, Inc. v. Jupiter Group, Inc.*, Civ. No. 3:04-CV-1540, 2006 U.S. Dist. LEXIS 43363, 2006 WL 1793223, at (M.D .Pa., June 27, 2006) (agreeing and citing cases holding that claim for breach of good faith and fair dealing is not independent cause of action, but part of a breach of contract claim); *In re K-Dur Antitrust Litig*., 338 F. Supp.2d 517, 549 (D.N.J. 2004) ('Although Pennsylvania imposes a duty of good faith and fair dealing on each party in the performance of contracts, there is no separate cause of action for breach of these duties . . . .') (citations omitted); *Blue Mt. Mushroom Co. v. Monterey Mushroom, Inc.*., 246 F. Supp. 394, 400-01 (E. D. Pa. 2002) ('Pennsylvania law does not recognize a separate claim for breach of implied covenant of good faith and fair dealing.'); *McHale v. NuEnergy Group*, No. Civ. A. 01- 4111, 2002 U.S. Dist. LEXIS 3307, 2002 WL 321797, at (E.D. Pa. Feb.27, 2002) (internal citations omitted) (same)." Under Pennsylvania law, parties asserting claims for breach of contract must allege the following three elements: "(1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resultant damages." Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 502 (E.D. Pa. 2008) (citing CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)); see also Mavrinac v. Emergency Med. Ass'n of Pittsburgh, No. 2:04 CV

1880, 2005 WL 2304995, at *8 (W.D. Pa. Sept. 21, 2005) (noting that to plead a breach of contract, "a plaintiff must assert the existence of a valid and binding contract; that the plaintiff has complied with [the] contract by performing her own obligations under it; [that] all conditions precedent were fulfilled; [that] there was a breach of the contract; and [that] damages were incurred" (citing Pierce v. Montgomery Cnty. Opportunity Bd., Inc., 884 F. Supp. 965, 970 (E.D. Pa. 1995))).

In this case, the mortgage and loan modifications were the written agreements breached for the bank defendants, and the agreement that Plaintiff entered into with Defendant Birch, is the agreement that he breached. Further, even through the Foreclosure case Defendants refused to act in good faith until they were practically forced to. As such, there is also a claim for a breach of covenant of good faith and fair dealing and the aforementioned facts make this breach abundantly clear. These actions caused the aforementioned actual damages of $166,021.88 and new actual damages being incurred at the rate of $62.37 for the increased payments above and beyond what was agreed to in the loan modification..

As to Birch, under § 5525, an action based on a breach of contract must be commenced within four years. It became clear that Birch breached his agreement September 15, 2016, when he made it clear that he never pursued the loan modification, which is exactly what he was hired to do in the first place to cure the deficiency.

In Pennsylvania, a breach of contract action involves (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages. J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.,792 A.2d 1269 (Pa.Super.2002).

In a breach of contract action, **damages are awarded to compensate the injured party for loss suffered due to the breach.** Maxwell v. Schaefer, 381 Pa. 13, 21, 112 A.2d 69, 73 (1955); Harman

*v. Chambers*, 358 Pa. 516, 521, 57 A.2d 842, 845 (1948); *Mancini v. Morrow,* 312 Pa.Super. 192, 204, 458 A.2d 580, 586 (1983).

The purpose of damages is to put the plaintiff in the position he or she would have been in but for the breach. Id.

The measure of recovery and the method of evaluation that are adopted should in every case be so adjusted as to attain as nearly as possible the purpose of our system of remedial justice. Id.

Further, damages are not limited merely to attorneys fees in  a matter like this. Coleman v. Morris, 58 A.3d 833 (Pa. 2012).

Damages can be claimed if "the alleged damages were such as would naturally and ordinarily result from the breach, were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and are capable of being proved with reasonable certainty." *Id.*

In this case, we have that; not only the fees Plaintiff had to pay out to Defendant Birch, but also to hire new counsel, as well as the damages she incurred from 1) Having to file bankruptcy, 2) Damage to her credit for years without any attempts to modify her loan, 3) damage the additional interest she is now forced to pay because of Birch's delay for years of not actually attempting to modify the loan and 4) consequential damages from the damaged credit, all of which can be shown to cause material harm to plaintiff.

At all times relevant and material hereto the Defendant did breach the contractual terms of the attorney representation agreement (contract) by failing to properly work for Plaintiff and for years, did nothing to actually help her resolve the issues properly, and save her home.

III.   THE UNJUST ENRICHMENT CLAIM SHOULD BE PERMITTED TO PROCEED

Under Pennsylvania law, a claim of unjust enrichment must allege the following elements: (1) plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit. *Com. ex. rel. Pappert v. TAP Pharm. Prods., Inc.*, 885A.2d 1127 (Pa. Commw. 2005).

Because of the numerous aforementioned misrepresentations, Defendants have been unjustly enriched at the expense of Plaintiff.

Defendants either through intentional actions or gross negligence have been enriched through their actions.

Accordingly, Defendants are attempting to receive a benefit through the sale of Plaintiff's home. Specifically, this caused, at least in part, the actual damages of $166,021.88 and new actual damages being incurred at the rate of $62.37 for the increased payments above and beyond what was agreed to in the loan modification.

This was because had he not delayed in working towards resolving the matter properly, these substantial arrears would not have accrued.

IV.   RESPA CLAIMS MUST BE PERMITTED TO PROCEED

In *Puche*, in regard to the damaged claim, the court stated "Damages, if awarded, would not nullify the state court's foreclosure judgment, because it would not challenge the transfer of the real property effectuated by the foreclosure." *Puche V. Wells Fargo Na*, Civ. No. 16-05195 (DNJ June 22, 2017). As such, the court stated that "there is no question that a finding for

16

[damages] in this Court would not render the state court's judgment ineffectual." *Id.* Violations of RESPA, or of Defendant's contractual duty of good faith and fair dealing, do not implicate the validity of the foreclosure judgment. *Id.* Further, since the Foreclosure case is now dismissed, it is not relevant in this case. The court further makes clear in *Bukowski v. Wells Fargo,* that if a loan servicer fails to abide by its borrower inquiry obligations, RESPA allows a plaintiff to recover two types of damages. *Bukowski v. Wells Fargo*, No. 17-3253 3rd Cir., December 13, 2018. First, the borrower may recover actual damages if he or she proves that (1) the loan servicer violated a particular RESPA requirement and (2) actual damages were sustained "as a result of the failure." 12 U.S.C. § 2605(f)(1)(A). *See also Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1246 (11th Cir. 2016) (citing *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1028 (11th Cir.2001) (en banc) (noting that "there must be a 'causal link' between the alleged [RESPA] violation and the damages"). Second, a borrower may seek statutory damages up to $2,000 if the damages are based on "a pattern or practice of noncompliance. . . ." 12 U.S.C. § 2605(f)(1)(B). In this case, the damages are clear; the Defendants have caused Plaintiff severe damage from the actions as stated in the Complaint.


V.    ANY ALLEGED STATUTE OF LIMITATIONS WERE TOLLED, DUE TO THE
      ONGOING LITIGATION

The statute of limitations in this case should be tolled because of the Continuing Violation Doctrine, Continuing Tort Doctrine or for various equitable reasons. In *Mandel v. M & Q Packaging Corp.*, No. 11-3913, 2013 WL 141890 (3d Cir. Jan. 14, 2013), the U.S. Court of Appeals for the Third Circuit "clarified" the application of the continuing violation doctrine as defined by the U.S. Supreme Court in *National Railroad Passenger Corp. v. Morgan*, 536 U.S.

101 (2002). Prior to *Morgan*, the Third Circuit had adopted from *Berry v. Board of Supervisors*, 715 F.2d 971 (5th Cir. 1983), a non-exhaustive list of three factors to help distinguish between the occurrence of isolated acts and a persistent, ongoing pattern of actions. In particular, *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476 (3d Cir. 1997) and *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 755 (3d Cir. 1995), contained dicta explaining that the Fifth Circuit Court of Appeals considered the (i) subject matter, (ii) frequency, and (iii) degree of permanence of the underlying acts. However, Post-*Morgan*, the court held that permanency is not required. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Having clarified the continuing violation doctrine post-Morgan, the Third Circuit determined that Mandel could proceed under a continuing violation theory. *Id.* Indeed, the Court concluded that Mandel had alleged at least one act fell within the statute of limitations period, and many of the acts that occurred prior to the applicable limitations period involved similar conduct by the same individuals – thus suggesting a persistent, ongoing pattern. *Id.*

Additionally, while this rule is generally applied in a discrimination action, it has been applied in other types of actions as well, and as such, can be used in this action to overcome the statute of limitations. One example, is "Antitrust law" such as in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, where at least some conduct made actionable under the antitrust laws is "continuing" in nature. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). *See Gonzaga Law Review* vol. 43:2, pages 308-326. In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, the plaintiff alleged that the defendant had embraced a practice of leasing, but not selling, its shoe manufacturing machines in order to monopolize the market for these devices. *Id.* at 483-84. This policy had been in effect for several decades at the time of suit, and the defendant invoked the statute of limitations as a defense. *Id.* at 495. The Supreme Court agreed

with the courts below that this claimed defense was of no avail to the alleged monopolist, observing that: "We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span.... Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on [the plaintiff]." *Id.* at 502 n.15.

In a decision rendered three years later, *Zenith Radio Corporation v. Hazeltine Research, Inc.*, the Court reaffirmed that at least some violations of the antitrust laws represent modified continuing violations. *Zenith Radio Corporation v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971). In Zenith, the Supreme Court tolled the limitations statute as to claims for future damages on the ground that these damages would have been speculative, at best, in any suit filed at an earlier juncture. *Id.* at 341-42. Zenith Radio, the Court posited the general rule that in the antitrust context, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Id.* at 338.

Additionally, the same rules have been applied to Civil Rights as well, which essentially is exactly the type of case that we are currently dealing with. *Virginia Hospital Association v. Baliles* involved a challenge under 42 U.S.C. § 1983 to a state procedure for reimbursing hospitals for the cost of treating Medicaid patients. . *Virginia Hospital Association v. Baliles,* 868 F.2d 653 (4th Cir. 1989). The plaintiff, a non-profit organization of Virginia health care providers, sought injunctive relief and a court order declaring the procedure unlawful. *Id.* at 656. The state invoked the statute of limitations as a defense, arguing that the plaintiff's claim was time-barred because the policy had been enacted more than two years (the relevant limitations period) prior to the filing of suit. *Id.* at 663. In rejecting the state's argument, the United States Court of Appeals for the

Fourth Circuit agreed with the district court that the plaintiff "had alleged an ongoing constitutional violation, and that the statute [of limitations] would not have begun to run until the violation ended." *Id.* The court of appeals also agreed with the district court's conclusion that "[t]he continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations,' *Id. Additionally, see generally Palmer v. Board of Education*, 46 F.3d 682 (7th Cir. 1995) (refusing to assert the statute of limitations for "series of wrongful acts that create a series of claims.").

As to the breach of contract, unjust enrichment and the other state claims, the statute that applies is the a four year statute, rather than a two year statue, as per either 42 Pa. Consol. Stat. § 5525(7), (8); 42 Pa. Consol. Stat. § 5529 for written contracts or  42 Pa. Consol. Stat. § 5525(3) for oral contracts. These relate to the modification that was offered and which payments were made on it, and only became apparent when the recent modification was signed, and the Foreclosure matter finally withdrawn.

## VI.    DISMISSAL WITHOUT PREJUDICE TO PURSUE REMAINING CLAIMS AGAINST BIRCH

<u>CONCLUSION</u>

Pursuant to the above, Plaintiff requests the order granting the motions to dismiss be vacated.

Dated: May 3, 2021                                  ____/s/ Joshua Thomas_____
                                                                    Joshua Thomas Esq.

20

Supreme Court ID No. 003992012
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone: (215) 806-1733
Email: JoshuaLThomas@gmail.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

Cary W. Drake;

       Plaintiff,

       v.

Wells Fargo Bank, N. A., et al.

       Defendants

CIVIL ACTION NO.: 2:16-CV-08797-MCA-LDW

*Civil Action*

## CERTIFICATION OF SERVICE

The undersigned hereby certified that a true, accurate, and correct copy of the aforementioned pleadings has been served upon all parties of record via the Court's ECF system on this same day.

Respectfully submitted,
 /s/ Joshua L. Thomas
Joshua L. Thomas Esq.